IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

THOMAS A. ARCHIPLEY II on behalf of THOMAS E. ARCHIPLEY GST TRUST AGREEMENT F/B/O THOMAS A. ARCHIPLEY II

    Plaintiff,

v.

TELLURIDE COUNCIL FOR THE ARTS AND HUMANITIES d/b/a TELLURIDE ARTS,

    Defendant.

## COMPLAINT

Plaintiff Thomas A. Archipley II ("**Mr. Archipley**") on behalf of the Thomas E. Archipley GST Trust Agreement f/b/o Thomas A. Archipley II (the "**Trust**"), by and through undersigned counsel, states the following as his Complaint against Defendant Telluride Council for the Arts and Humanities d/b/a Telluride Arts ("**Telluride Arts**"):

### I.    NATURE OF THE CASE

1.    This is an action to place reasonable limits on an open-air concert venue that has opened ten feet from Mr. Archipley's bedroom window in the Town of Telluride. When Mr. Archipley purchased his third-floor condominium in 2019, he had no reason to believe that the next-door Telluride Transfer Warehouse (the "**Warehouse**") would soon begin hosting concerts and events so loud that he would not be able to hold a conversation or hear the basketball play-by-play on his TV. The Warehouse had sat open to the elements since the roof collapsed in the late 1970s, and the land use documents governing the repurposing of the building promised cultural events and "acoustic" music in an "encase[d]" structure. The Town's earlier zoning approvals required Telluride Arts to rehabilitate the Warehouse and to install a historic, complete roof enclosing the venue.

2.    Discarding those requirements, Telluride Arts pursued what its director called a "fake it till you make it" approach and began hosting open-air concerts, often multiple times a week, with amplified music blasting past 9:00 p.m. The Town looked the other way. Then, in March of this year, Telluride Arts received approval from the Town to do away with the complete roof requirement altogether. Mr. Archipley and his neighbors pleaded for reasonable limits on concert noise, and at the very least a requirement that Telluride Arts' events comply with Colorado's statutory bare-minimum noise standards. Telluride Arts and the Town refused and

doubled down. The organization continued to hold loud concerts and has so far declined to conduct a noise study to estimate its impacts, declined to include noise standards in its land use approval, and declined to pursue any sound mitigation efforts. The Town has likewise refused to enforce its noise ordinance against events at the Warehouse.

3. A week after receiving its approval, and hearing about its events' effects on neighbors, Telluride Arts held yet another concert, registering at 93 decibels, about as loud as a lawnmower in the same room.

4. Left with no other options, Mr. Archipley is filing this action to abate Telluride Arts' ongoing nuisance and to make his home and the homes of his neighbors livable once again.

## II. PARTIES AND PROPERTIES

5. Mr. Archipley is an individual and a resident of Okemos, Michigan.

6. The Trust is a trust with a situs in Michigan. Mr. Archipley is a co-trustee and beneficiary of the Trust. The Trust's single other co-trustee has delegated to Mr. Archipley the full authority to bring this action on behalf of the Trust.

7. The Trust owns the property commonly known 215 W. San Juan Avenue, 301 Fir House, Telluride, Colorado 81435 (the "**Residence**").

8. Telluride Arts is a Colorado non-profit corporation with a principal place of business located at 135 West Pacific, PO Box 152, Telluride, Colorado 81435.

9. Telluride Arts owns or controls property immediately adjacent to the Residence, legally described as Lots 5R-R and 75, Block 17, Town of Telluride.

10. The only permanent structure on this property comprises the remaining four walls of the Warehouse, constructed in 1906, and pictured below.



11. The Residence occupies the third floor of the gray building immediately adjacent to the Warehouse in the image above. The relative locations of the Warehouse (in red) and the Residence (in blue) appear in the vicinity map below:




### III.   JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

13. Mr. Archipley, as both an individual and as co-trustee and beneficiary of the Trust, is a citizen of Michigan. The Trust's situs is located in Michigan. Telluride Arts is a Colorado non-profit corporation with its principal place of business in Colorado. Therefore, complete diversity exists between the parties.

14. The amount in controversy exceeds $75,000. Although Mr. Archipley contends that Telluride Arts' interference with his and his family's use and enjoyment of the Residence cannot be quantified, because the Residence is worth several million dollars, and Telluride Arts' noisy events make it unusable multiple days per week, many months out of the year—and threaten to do so in perpetuity—the value of relief from Telluride Arts' nuisance exceeds $75,000.

15. Additionally, and upon information and belief, Telluride Arts' costs to implement or comply with the injunctive relief requested (e.g., installing sound mitigation measures and permanently limiting business hours) will incur costs greater than $75,000.

16. Thus, whether viewed from the perspective of the value of the relief to the plaintiff or the cost of compliance to the defendant, the amount in controversy exceeds the jurisdictional requirement. *See Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006).

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Mr. Archipley's claims arise from conduct occurring in the Town of Telluride (the "**Town**" or "**Telluride**"), San Miguel County, Colorado, and because the Warehouse is located in the Town and San Miguel County, and because Telluride Arts is a Colorado corporation.

### IV.   GENERAL ALLEGATIONS

18. In 2019, Mr. Archipley purchased the Residence as a family getaway from his permanent home in central Michigan. The Archipley family had visited Telluride for years, and the newly constructed Residence offered both a mountain escape and the convenience of in-town amenities.

19. When Mr. Archipley purchased the Residence, the next-door Warehouse stood as an empty shell. Its roof had collapsed in the 1970s and only the stone exterior walls remained. The Residence's master bedroom and guest bedroom are adjacent to the Warehouse and are approximately ten feet from the Warehouse's southern wall.

20. The recorded documents and Town regulations available when Mr. Archipley purchased the Residence stated that the Warehouse would be rehabilitated into its historic condition, and that it would serve as an intimate, enclosed space for cultural events. A 2016 "Preliminary Program Summary," which the Town had approved as the regulatory management plan for the Warehouse, promised an "iconic" space for "community gatherings, such as lectures,

parties, celebrations, acoustic music, poetry readings and literary events, small film screenings, artist presentations, public gatherings, art installations, meetings, lectures, artist-in-residence, and temporary studios." It also noted that the "historic exterior" would "encase" the space.

21. The Town's Planned Unit Development zoning classification likewise required a complete roof as part of the Warehouse's rehabilitation, and even Telluride Arts' attorney recognized that the organization was required to deliver a "warm, dark shell." That is, a covered building, not an outdoor stage.

22. None of these plans created a concern for Mr. Archipley. If anything, cultural events like lectures and art installations, enclosed in the building next door, made living in Telluride quite appealing to Mr. Archipley and motivated the purchase of the Residence.

23. Then the reality arrived: in the late spring of 2020, Telluride Arts began using the Warehouse as an open-air concert venue. When summer returned in 2021, Telluride Arts scheduled at least 12 hours of amplified music per week.

24. The performances were not merely "acoustic" and instead included rock and jam bands blasting amplified music late into the evening. Performances routinely ran past 9:00 p.m. and rattled the Residence.

25. During the summer of 2021, a neighbor located 300 feet from the Warehouse recorded performances at 78 decibels and above, approximately twice as loud as a vacuum cleaner in the same room.

26. Inside the Residence, whenever Telluride Arts holds a concert—which can be multiple times per week during the warmer months—Mr. Archipley cannot hear his own TV or hold a conversation in many parts of his home.

27. Neither the Warehouse's zoning nor the preliminary management plan had contemplated the Warehouse's pre-rehabilitation use to include rock and jam band concerts in the open air and Telluride Arts' own director described the pre-rehabilitation period as the organization's "fake it till you make it" phase.

28. The current makeshift concert venue appears in the photo below:



29. Evidently enamored with its outdoor concert space, Telluride Arts then discarded its plans to enclose the Warehouse with a roof and began pursuing a PUD amendment to allow a partial roof instead, and by extension, an open air concert venue. In fact, plans from Telluride Arts' architect indicated that the covered portion of the Warehouse would become a rooftop deck with a bar and café where more performances and events would occur directly across from Mr. Archipley's bedroom.

30. At this point, Mr. Archipley grew more concerned. The PUD had required a full roof, so the outdoor venue was supposed to be temporary. However, the amendment and accompanying materials demonstrated the organization's intent to make outdoor concerts a permanent feature.

31. Mr. Archipley and other neighbors repeatedly alerted Telluride Arts to their concerns about this plan, and about the impacts the organization's concerts were having on their wellbeing.

32. Telluride Arts disregarded those concerns and charged ahead. Instead of offering sound-mitigation measures for its outdoor programming or conducting a sound study to assess the projected impacts from its proposed open air venue and rooftop bar, Telluride Arts orchestrated a public relations campaign against the neighbors, describing the Warehouse as "under attack" from "a small number of people . . . trying to derail the project."

33. Telluride Arts' campaign even admitted that "we do understand the impact on neighbors has been greater during this unprecedented time" but Telluride Arts never offered to make any changes to its outdoor concerts and noisy events.

34. The Town, too, expressed little sympathy for neighbors' concerns. When neighbors contacted the Town marshal during particularly noisy concerts, the marshal stated that he alone would determine whether the noise was unreasonable and in violation of the Town's noise ordinance. He declined to take action.

35. On March 24, 2022 representatives for Telluride Arts appeared before the Town's Planning Commission in pursuit of the PUD amendment to eliminate the PUD's complete roof requirement and to, by extension, allow open-air concerts in perpetuity.

36. At that public hearing, Mr. Archipley, through counsel, again noted that Telluride Arts' events were running late into the night and that Mr. Archipley could not hear his television or hold a conversation inside his Residence. He requested reasonable noise limitations, including a prohibition on amplification and noise standards consistent with state statute, C.R.S. § 25-12-103.

37. Another neighbor described Telluride Arts' unwillingness to address noise complaints, or to engage with concerned neighbors, explaining:

> My last point and I don't want it to sound harsh, but my wife and I and a number of others have been trying to get the Transfer Warehouse and [Telluride Arts] to engage on some of these concerns. We have personally asked for meetings and been stood up. We've asked to meet and address some of these issues. And despite the comments today, my phone is not ringing. No one is responding and engaging on these issues. I think there are paths forward, but you can't tell us you want to work with us and then not respond to calls and requests for meetings.

38. The Planning Commission declined to include any noise standards, nor did it require Telluride Arts to provide any information regarding projected sound impacts or to implement sound mitigation measures. On the road to approving the PUD amendment, one commissioner actually observed that Telluride was not noisy enough.

39. Even though the Planning Commission declined to add noise standards to its PUD amendment approval, having been made aware of its impacts on neighbors, and on Mr. Archipley in particular, Telluride Arts could have volunteered to include its own standards and mitigation requirements.

40. Telluride Arts again declined to propose any relief at all. It has refused requests to eliminate amplification. It has declined to comply with state noise limits.

41. A week after the Planning & Zoning Commission ("**P&Z**") approved the PUD amendment, Telluride Arts held yet another amplified concert. From Thursday afternoon into the early evening, the decibel levels measured *inside* the Residence consistently reached 77 decibels and peaked at 93 decibels. For a frame of reference, a motorcycle engine emits 95 decibels of noise, and exposure to noise levels at or above 70 decibels can lead to hearing loss.

42. On May 10, Mr. Archipley appealed P&Z's PUD amendment approval to the Town Council, trying one last time to add reasonable noise mitigation conditions to Telluride Arts' open-air concept. The Town Council affirmed Planning Commission's approval without conditions, and Mr. Archipley is appealing that decision in state court in *Thomas A. Archipley II on behalf of the Thomas E. Archipley GST Trust Agreement v. Telluride Town Council; Telluride Planning and Zoning Commission; Town of Telluride; and Telluride Council for the Arts and Humanities d/b/a Telluride Arts*, San Miguel County District Court Case No. 2022CV030021 (filed June 7, 2022).

43. Telluride Arts has indicated that it will continue to hold outdoor concerts, with amplification and without sound mitigation, irrespective of Mr. Archipley's concerns or the concerns of other neighbors. Its summer events calendar already identifies concerts from "Disco Fuego," "Birds of Play," "Sol Chase," "Tom and Claybrook," and "High Country Hustle" in the last few weeks of June alone. Given the approval of the PUD amendment allowing for an open-air concert venue, Mr. Archipley has every reason to believe those concerts will become a permanent feature of life next to the Warehouse, and Telluride Arts' events calendar identifies multiple concerts in the coming weeks.

44. Because neither the Town nor Telluride Arts has made any effort to address Telluride Arts' noise impacts, which make the Residence unlivable many days out of the year, Mr. Archipley has been left with no choice but to file this action.

## FIRST CLAIM FOR RELIEF
### (Private Nuisance)

45. Mr. Archipley incorporates the foregoing allegations as though fully set forth herein.

46. Telluride Arts' conduct in holding numerous outdoor concerts and events with sound amplification have unreasonably interfered with Mr. Archipley's use and enjoyment of the Residence.

47. The interference from these concerts and events, which last for hours and well into the night, is so substantial that it would be offensive and cause inconvenience to a reasonable person in the community. A reasonable community member, for instance, would not tolerate noise so loud that he or she was unable to hold a conversation at home for hours at a time, and sometimes past 9:00 p.m., yet Mr. Archipley endures just that, multiple days per week.

48. Telluride Arts' interference was negligent or intentional. Mr. Archipley and his neighbors made Telluride Arts aware of its noise impacts on numerous occasions, yet just a week after Mr. Archipley's counsel described those impacts at the Town's Planning Commission hearing, which Telluride Arts' counsel and director attended, Telluride Arts held another deafening concert.

49. Telluride Arts therefore knew or should have known that it was perpetuating the same interference with Mr. Archipley's use and enjoyment of the Residence.

50. Without relief from this Court, Telluride Arts' nuisance will continue unabated.

51. As a result of Telluride Arts' interference, Mr. Archipley has suffered and will continue to suffer damages.

## SECOND CLAIM FOR RELIEF
### (Public Nuisance Pursuant to C.R.S. § 25-12-101 *et seq.*)

52. Mr. Archipley incorporates the foregoing allegations as though fully set forth herein.

53. The Residence and the Warehouse are located in a "Commercial Zone" as defined in C.R.S. § 25-12-102(1). The surrounding blocks include a wide range of small-scale commercial and residential uses, including a market, an indoor art gallery, multi-family residential buildings, single-family residences, a brewpub, and several restaurants.

54. Pursuant to C.R.S. § 25-12-103(1), the statutory noise limits in a commercial zone are as follows:

   a. From 7:00 a.m. to 7:00 p.m.: 60 decibels

   b. From 7:00 p.m. to 7:00 a.m.: 55 decibels

55. Sound levels from Telluride Arts' events at the Warehouse have exceeded these statutory limits on at least two monitored occasions, first when levels were recorded at or above 78 decibels during the summer of 2021, and again when they were consistently monitored at 77 decibels, with a peak of 93 decibels on March 31, 2022. Mr. Archipley has subjectively experienced the same or greater levels of noise on many other dates.

56. These sound levels are prima facie evidence of a public nuisance. C.R.S. § 25-12-103(1).

57. Mr. Archipley is entitled to a permanent injunction prohibiting Telluride Arts from maintaining or permitting sound levels in excess of those set forth above. C.R.S. § 25-12-104.

## THIRD CLAIM FOR RELIEF
(**Permanent Injunction**)

58. Mr. Archipley incorporates the foregoing allegations as though fully set forth herein.

59. Telluride Arts' nuisance results from the organization's failure to place reasonable limits on its events and/or to employ or install reasonable sound mitigation measures and techniques.

60. An injunction requiring the following would abate Telluride Arts' nuisance:

   a. Amplified music shall be prohibited;

   b. Sound levels shall not exceed 60 decibels between 7:00 a.m. and 7:00 p.m. and shall not exceed 55 decibels between 7:00 p.m. and 7:00 a.m., as measured in accordance with C.R.S. § 25-12-103; and

   c. Telluride Arts shall install sound measuring devices to ensure compliance with the above standards during musical performance.

61. Telluride Arts has perpetuated and will continue to perpetuate sound levels in excess of those set forth in C.R.S. § 25-12-103 as well an unreasonable, and intentional, interference with Mr. Archipley's use and enjoyment of the Residence.

62. In losing the ability to use the Residence without interference, Mr. Archipley will continue to be irreparably harmed.

63. The injury to Mr. Archipley outweighs the harm the requested injunction will cause to Telluride Arts. Mr. Archipley does not seek the elimination of concerts and events at the Warehouse, only reasonable limitations on the sound from those events, consistent with state standards.

64. The injunction will not harm the public interest. The public has the right to be free from excessive noise, as recognized by C.R.S. § 25-25-101 *et seq.*, and an injunction reasonably limiting that noise will advance the public interest, not harm it. An injunction will allow Mr. Archipley's neighbors, many of whom have complained about the intense noise levels, to once again live peaceably next to the Warehouse.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the following judgments and orders be entered against the Telluride Arts and in favor of Mr. Archipley:

   A. A judgment that Telluride Arts has maintained a private nuisance;

B.   A judgment that Telluride Arts has maintained a public nuisance in violation of C.R.S. § 25-12-103;

C.   An injunction prohibiting Telluride Arts from maintaining a private and public nuisance as follows:

1. Amplified music shall be prohibited;

2. Sound levels shall not exceed 60 decibels between 7:00 a.m. and 7:00 p.m. and shall not exceed 55 decibels between 7:00 p.m. and 7:00 a.m., as measured in accordance with C.R.S. § 25-12-103; and

3. Telluride Arts shall install sound measuring devices to ensure compliance with the above standards during musical performance.

D.   In the alternative, a judgment for damages to be proven at trial; and

E.   Such additional relief as may be provided by law or the Court may deem just and proper.

Respectfully submitted this 7th day of June, 2022.

/s/ Andrew L.W. Peters
Andrew L.W. Peters
Bill E. Kyriagis
Rebecca C. Sokol
Otten, Johnson, Robinson, Neff
   & Ragonetti, P.C.
950 Seventeenth Street, Suite 1600
Denver, Colorado  80202
Telephone:  303 825 8400
Facsimile:  303 825 6525
apeters@ottenjohnson.com
bkyriagis@ottenjohnson.com
rsokol@ottenjohnson.com

*Attorneys for Plaintiff*